**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
────────────────────────────────────

**UNITED STATES OF AMERICA,**

                **Plaintiff,**

                **v.**                            **06-CR-284S**

**ENRIQUE SEXTO,**

                **Defendant.**
────────────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. William M. Skretny in accordance with 28 U.S.C. § 636(b)(1) for all pretrial matters and hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

        The defendant Enrique Sexto ("the defendant") is charged in a Superseding Indictment with having violated Title 21 U.S.C. § 846 (Count I).  (Docket #128).  There are nine other co-defendants similarly charged, some of whom are also charged with having violated Title 21 U.S.C. §§ 841(A)(1) and 841(b(1)(B) and Title 18 U.S.C. § 2.  (Docket # 128).

        The defendant has filed a motion to suppress evidence "acquired as a result of electronic surveillance and search warrants utilized and executed during this investigation [of the defendant]."  (Docket # 176).  The co-defendants, Luis Pabon, Jose

Lao and Jose Matos Quinones have joined in this motion.  The government filed its response in opposition to the motion.  (Docket # 178).  Thereafter, an evidentiary hearing was held by this Court on December 6, 2007 and a transcript of the proceedings was filed on January 8, 2008.[1]  Post hearing memoranda were filed on behalf of the defendants (Docket #192) and the Government (Docket # 191) on February 15, 2008.

## **FACTS**[2]

Sometime in March or April 2005, the FBI became aware of drug trafficking activity being carried out by the defendants Enrique Sexto and Jose Lao in the Western New York area and northern Pennsylvania.  (T. 6 - 7).  An investigation was initiated and "physical surveillances, consensually recorded telephone calls, attempted consensual recorded telephone calls and controlled narcotics purchases" were conducted by the FBI as part of this investigation.  (T. 7).  It was determined "that there were numerous individuals that were actually engaged in the conspiracy to distribute heroin" and the aforesaid investigative techniques were used to determine "the full scope of the conspiracy" and to "collect information on the individuals [involved], who they associated with, vehicles that are being driven, items of movement, that sort of thing."  (T. 7 - 8).  However, the agents conducting the investigation were

---

[1]     References to this transcript will be designated "T" followed by the appropriate page numbers.

[2]     The facts set out herein are taken from the transcript of the testimony given at the evidentiary hearing on December 6, 2007 and from the exhibits received at said hearing.

not able "to obtain evidence as to conversations that were being made between the people [they] were watching."  Also, it became apparent to the agents that the individuals being investigated "knew they were being watched or suspected they were being watched by law enforcement" based on information received from confidential sources.  (T. 8-9, 59).  The suspects in this investigation "had numerous people out and about, expanded area, (*sic*) two to three blocks out just looking for people out of the ordinary that might be law enforcement."  (T. 10). An e-mail exchange on the issue of using pole cameras took place in September 2005 between S.A. Yervelli and a representative in the office of Chief Division Counsel of the FBI. "The substance of the communication would have been to determine what legal issues would have needed to be addressed" in order to obtain authorization from the Chief Division Counsel's office for the installation of pole cameras. (T.23-25, 64-65). A formal request seeking approval for "a technical site survey for pole cameras and a subsequent installation of pole cameras for the purpose of capturing surveillance intelligence on [the] subjects of [the investigation] as well as license plate information" was submitted and approval for such installation was given on or about October 4, 2005. (Government Exhibit 4) (T.26). Nevertheless, the investigating agents concluded "that the only way for [them] to try to identify additional individuals and expand the scope of the investigation to include those individuals [they] didn't currently have identified was to apply for a federal court authorized wire communications interception under Title III" since this "would give [them] the ability to listen to the conversations that the subjects were having regarding their activities and other associates that [they] didn't have identified."  (T. 10-11).  Also, by having access to such conversations, the agents would "know when [the suspects]

3

have observed [them]" and would enable them "to know sometimes what [the suspects] are thinking; where they're going, what they're going to be doing; when they're going to be doing it."  (T. 11).

S.A. John A. Yervelli, Jr. executed a ninety-five (95) page affidavit which he swore to on October 25, 2005 before the Hon. William M. Skretny in support of the Government's application for an order authorizing the interception of wire communications.  (Government Exhibit 1).  This affidavit of S.A. Yervelli describes in great detail the history of the investigation to date and information obtained based on prior state wiretap orders, use of confidential informants, physical surveillance, pen registers and review of various records.  However, there is no mention made in the affidavit as to the use of pole cameras or why such use was not feasible or whether any sort of evaluation had been made concerning the use of pole cameras notwithstanding that S.A. Yervelli "thought about using pole cameras as an investigative technique sometime in September 2005" and had received authorization for the installation of such cameras prior to submitting his affidavit  to Judge Skretny. (T. 22, 61, 76-77,81,85, 92) (Government Exhibit 4).  In explaining why no mention was made of a contemplated use of pole cameras in his affidavit, S.A. Yervelli testified that he believed that the use of pole cameras "was just a continuation of physical surveillance" and that they would not have obtained any additional evidence. (T.23,33, 77). He considered the pole camera surveillance to be "the same thing" as physical surveillance except that the agents would not have to be physically present and run the risk of being observed by those being investigated. Since he considered the pole camera usage to be "an

4

enhancement of physical surveillance" that "was going to support [their physical] surveillances", which he did describe in his affidavit sworn to October 25, 2005 he did not think that it was necessary to specifically make mention of the possible use of pole cameras. (T.33, 73,79-80, 81-82, 94) (Government Exhibit 1 pp. 82-85).

On October 25, 2005 an "Order Authorizing The Interception Of Wire Communications" was granted by the Honorable William M. Skretny authorizing the interception of wire communications relating to the investigation of the defendants herein. (Government Exhibit 1).Sometime after the granting of this Order, site surveys were conducted for the purpose of installing pole cameras and technical equipment was obtained. (T.28). However, no attempt was made to file a "supplemental affidavit" with Judge Skretny as to "necessity" and the use or evaluation on the use of pole cameras. (T.86).

Upon application by government counsel, this Court issued an order on November 1, 2005 and on November 8, 2005 authorizing the installation of telephone lines pursuant to 28 U.S.C. § 1651 for the purpose of servicing pole cameras so as to provide for the collection of information relevant to the ongoing investigation of the defendants herein. (Government Exhibits 5 and 6 respectively) (T.29-31).

On November 4, 2005 a "First Ten Day Report" was submitted to Judge Skretny wherein it was reported that:

FBI personnel are in the process of installing "Pole

Cameras" in the area of 258 Hudson Street and the garage located at 1073 Niagara Street. These cameras are necessary to assist with corroboration of information from the wire interceptions and because the subjects of the Investigation are very surveillance conscience.

(Government Exhibit 7) (T.34-35, 37, 87, 91-92).

Thereafter, on November 23, 2005 an application for an order authorizing the continued interception of wire communications in the investigation of the defendants was submitted by the Government to Judge Skretny.  (Government Exhibit 2).  In the affidavit of S.A. Yervelli sworn to November 23, 2005 in support of said application, disclosure is made that one of the "traditional investigative techniques utilized thus far" is the "use of surveillance cameras in public areas near selected locations associated with subjects of this investigation."  (Government Exhibit 2, pp. 82, 89) (T. 51-52).  An "Order Authorizing The Continued Interception of Wire Communications" was granted by Judge Skretny on November 23, 2005.  (Government Exhibit 2) (T. 50).

On December 8, 2005, the Government made an application for a "spinoff eavesdrop warrant," *i.e.*, an authorization to intercept wire communications occurring over another telephone not covered by the prior intercept orders.  (Government Exhibit 3) (T. 52).  In support of this application, S.A. Yervelli, in his affidavit sworn to December 8, 2005, advised that, among other things, pole cameras were used as "surveillance cameras in public areas near selected locations associated with subjects of this investigation" and that those cameras would continue to be used to "assist surveillance units with conducting surveillance in the future."  (Government Exhibit 3,

6

pp. 90, 96-97) (T. 55).

Disclosure of the use of pole cameras was done in the affidavits of S.A. Yervelli sworn to November 23 and December 8, 2005, "because they were now being used and they were there." (T. 56).  An "Order Authorizing The Interception of Wire Communications" was granted by the Honorable William M. Skretny on December 8, 2005.  (Government Exhibit 3).

## DISCUSSION AND ANALYSIS

The defendants claim that "the government made intentional (sic) false or misleading statements in order to persuade the Court that a wiretap was necessary." (Docket # 176, ¶ 24.)  In support of this claim, they reference the affidavit of S.A. Yervelli in support of the wiretap application wherein it is stated: (1)" that normal investigative procedures have either been tried without success, or reasonably appear unlikely to succeed if continued;" (2)" [Yervelli] believes that the interception for wire communications as applied for herewith is the only available investigative technique which has a reasonable likelihood of securing the evidence needed to ascertain the identities of, and . . .;" and (3) "all normal avenues of investigation have been carefully evaluated for use or have been attempted with only limited results."  (Docket # 176, ¶ 24).  The defendants argue that the aforesaid quoted references "by Yervelli constitute affirmative misrepresentations intended to make his affidavit misleading" since the use of "pole cameras [was] not carefully evaluated prior to the government application for a wiretap order" and that "interception of wire communications was not

7

the only available investigative technique" since "the pole cameras were an investigative procedure that reasonably appeared likely to succeed" especially since "the pole cameras [that were subsequently installed] ran for a period almost co-extensive with the wiretap orders."  (Docket # 176, ¶ 25).  The defendants further assert that "these affirmative misrepresentations or omissions were material" and that if they had been disclosed in the application for a wiretap order, as required, "it is doubtful the Court would have issued the 10/25/05 eavesdrop warrant had it been made aware that other normal investigative techniques, such as pole cameras, would have been effective."  (Docket # 176, ¶ 26).  As a result, the defendants argue that the Court "should delete the false or misleading statements and insert the omitted truths" and after doing so, "under these circumstances, the Court must grant suppression."  (Docket # 176, ¶ 27).

In response, the Government argues "that the use of pole cameras after the warrant was signed is of no significance as it relates to the truth and veracity of Special Agent Yervelli's affidavit" and that "the affidavit reveals that Judge Skretny was adequately informed that normal investigative techniques have been tried and failed" and "the fact that other techniques remained available for use has no affect on the veracity of the affidavit or the requirement for necessity."  (Docket # 178, p. 4).

Since the holding in *United States v. Torres*, 901 F.2d 205 (2d Cir.), *cert. denied* 498 U.S. 906 (1990), addresses the issue raised by the defendants on whether 18 U.S.C. § 2518(1)© was complied with, it is worthwhile to sacrifice brevity and set

forth that Court's ruling in detail.

Section 2518(1)© requires that an application for such an interception shall include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. . . ."  Similarly, section 2518(3)© requires the judge to whom an application for a wiretap is made to determine, as a condition of authorizing the tap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. . . ."

The application for the wiretap in this case was based upon a thirty-six page affidavit by DEA agent Timothy J. Sullivan dated May 27, 1987.  Flores contends that when the application for a wiretap was made, traditional law enforcement methods had already achieved "extraordinary success . . . in penetrating the deepest reaches of the Torres Organization," and that the "affidavit utterly failed to establish, even on a superficial level, that less intrusive techniques had not been successful and could not be successful."  In advancing this position, Flores points out that our decision in *United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983), precludes the authorization of wiretaps based upon "generalized and conclusory statements that other investigative procedures would prove unsuccessful," *id*. at 104.  Flores also argues that it does not suffice to show that a case belongs to some general class of cases which require wiretap investigation, citing *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975) (gambling case).

We are unpersuaded, and conclude that the application in this case provided a sufficient basis for authorizing the Flores wiretap.  Section 2518 "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).  As we have stated:

"[T]he purpose of the statutory requirements is not to preclude resort to electronic surveillance

until after all other possible means of
investigation have been exhausted by
investigative agents; rather, they only require
that the agents inform the authorizing judicial
officer of the nature and progress of the
investigation and of the difficulties inherent in
the use of normal law enforcement methods."

*United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.
1979) (quoting *United States v. Hinton*, 543 F.2d 1002, 1011
(2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50
L.Ed.2d 589 (1976)), *cert. denied*, 444 U.S. 981, 100 S.Ct.
484, 62 L.Ed.2d 408 (1979), 1019, 100 S.Ct. 674, 62
L.Ed.2d 649 (1980); *see also United States v. Fury*, 554
F.2d 522, 530 (2d Cir), *cert. denied*, 433 U.S. 910, 97 S.Ct.
2978, 53 L.Ed.2d 1095 (1977).

The role of an appeals court in reviewing the issuance of a
wiretap order, furthermore, "is not to make a *de novo*
determination of sufficiency as if it were a district judge, but
to decide if the facts set forth in the application were
minimally adequate to support the determination that was
made." *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.)
(collecting cases), *cert. denied*, 431 U.S. 960, 97 S.Ct. 2687,
53 L.Ed.2d 278 (1977).  And, as the *Scibelli* court went on to
say:

[I]n determining the sufficiency of the
application a reviewing court must test it in a
practical and common sense manner. The
legislative history makes clear that section
2518(1)© is not designed to force the
Government to have exhausted all "other
investigative procedures".

"The judgment [of the district judge] would
involve a consideration of all the facts and
circumstances.  Normal investigative
procedure would include, for example,
standard visual or aural surveillance
techniques by law enforcement officers,
general questioning or interrogation under an
immunity grant, use of regular search warrants,
and the infiltration of conspiratorial groups by
undercover agents or informants.  Merely

10

> because a normal investigative technique is
> theoretically possible, it does not follow that it
> is likely.  What the provision envisions is that
> the showing be tested in a practical and
> commonsense fashion.
>
> S.Rep. No. 1097, 90th Cong., 2d Sess., 1968
> U.S.Code Cong. & Admin.News, p. 2190
> (citations omitted).

*Scibelli*, 549 F.2d at 226.

*Id.* at 231-232) (brackets included); *See also United States v. Diaz,* 176 F.3d 52, 111

(2d Cir.), *cert. denied* by *Rivera v. United States,* 528 U.S. 875 (1999).


The necessity requirement is subject to the analysis set forth in *Franks v.*

*Delaware*, 438 U.S. 154 (1978) for challenging the veracity of S.A. Yervelli's affidavit of

October 25, 2005 in support of the application for the wire intercept order of October 25,

2005.  *United States v. Moran*, 349 F.Supp.2d 425, 461 (N.D.N.Y 2005) citing *United*

*States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985).  "As with the inclusion of false

information, '[o]missions from an affidavit that are claimed to be material are governed

by the same rules.'"  *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.), *cert.*

*denied*, 747 U.S. 841 (1985); *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir.

2000).  Therefore, in order to determine whether an omission in the wire interception

application was material to the finding of necessity, the hypothetical effect on the

original determination must be considered.


To determine whether the alleged "omission" was "material" on the issue

of "necessity" for the intercept order of October 25, 2005 (Government Exhibit 1), it

must be determined if Judge Skretny would have denied the wiretap application had the omitted information relating to the use of pole cameras been included in S.A. Yervelli's affidavit of October 25, 2005.  If the inclusion of such omitted information would not have caused him to deny such application, the omissions are not material.  In making this analysis, the affidavit with the inclusion of the omitted information is not to be read in a hyper technical way, but rather, must be reviewed in a common sense manner. *United States v. Ventresca*, 380 U.S. 102, 109 (1965); *United States v. Canfield, supra* at 719.

The eavesdropping application and supporting affidavit of S.A. Yervelli of October 25, 2005 did contain a detailed factual explanation of the traditional investigative techniques that were used, including "the use of confidential sources, controlled evidence purchases of illegal drugs, the attempted introduction of an undercover officer, search warrants, pen registers, review of telephone tolls records, interviews, and **physical surveillance.**"  (Emphasis added) (Government Exhibit 1, p. 77).  A detailed description was also given of those investigative techniques "considered, but not deemed likely to succeed" and the reasons for such belief. (Government Exhibit 1, pp. 77-92).

There is no requirement that all traditional law enforcement investigative techniques be exhausted prior to applying for a wire interception order.  *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir.) *cert. denied* by *Rivera v. United States,* 528 U.S. 875 (1999).  Nor is there any requirement "that any particular investigative procedures

12

[must] be exhausted before a wiretap may be authorized."  *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997), *cert. denied*, 524 U.S. 905 (1998); *United States v. Young*, 882 F.2d 1234, 1237 (2d Cr. 1987).

Common sense dictates that pole cameras would merely produce images of what appeared in their fixed sight line and within a limited scope of focus.  In other words, the use of pole cameras constitutes nothing more than another form of physical surveillance.  They would not provide the evidence that the agents were seeking to acquire, namely, "evidence against such individuals for the stated offenses to the point of establishing a prosecutable case against those individuals and others unknown, with proof beyond a reasonable doubt" as well as establishing "the identification of individuals not presently known who have been and will continue to participate in the aforementioned violations" as well as allowing "law enforcement personnel to identify the precise nature, scope, extent and methods of the" conspiratorial drug operation being investigated.  (Government Exhibit 1, pp. 3-4, 76, 82-85, 85) (T. 10-11).

This Court finds the explanation given by S.A. Yervelli as to why he did not exclude the contemplated use of pole cameras in his affidavit of October 25, 2005 to be credible and reasonable, to wit, that he considered the use of pole cameras to be merely "a continuation of physical surveillance" or to be "the same thing" as physical surveillance or "an enhancement of physical surveillance."  (T. 33, 73, 79-80, 81-82, 94).

13

It is the opinion of this Court that the inclusion of the use of pole cameras as an investigative tool considered by the agents in the affidavit of S.A. Yervelli sworn to October 25, 2005 amounts to nothing more that a cumulative iteration of what had already been disclosed, to wit, "physical surveillance."  When reading the affidavit of S.A. Yervelli sworn to October 25, 2005 with the included omission, common sense application causes me to conclude that nothing new or of substance is added. Therefore, I find that such omission was not material for purposes of allowing Judge Skretny to make a determination as to the "necessity" requirement in granting the intercept order of October 25, 2005.  *See United States v. Canfield, supra; United States v. Moran, supra*.

I further find that S.A. Yervelli, based on his testimony given at the hearing of December 6, 2007, did not seek or intend to deceive Judge Skretny nor did he or any other agent act in a reckless manner in presenting the application for the intercept order of October 25, 2005 for purposes of inducing the judge to authorize the wire interception in question.  The defendants have not presented a scintilla of evidence to establish that such omission as claimed by them, was intentional or reckless so as to mislead the judge for purposes of inducing him to authorize the wire interception in question.  The defendants have failed to meet their burden and therefore, their motion to suppress should be denied.  *Franks v. Delaware, supra; United States v. Canfield, supra; United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).

It is also pointed out that the good faith actions of S.A. Yervelli and the

14

investigating agents is further corroborated by the disclosure made in the "First Ten Day Report" to Judge Skretny wherein the judge was advised that "FBI personnel [were] in the process of installing 'Pole Cameras' in specified locations."  (Government Exhibit 7) (T. 34-35, 37, 87, 91-92).  If Judge Skretny had considered this disclosure to be new information that was "material" to his determination of whether the October 25, 2005 intercept order should have been granted, he could have immediately ordered the discontinuance of the wire interception pursuant to 18 U.S.C. § 2518(b)(6).  Instead, the wire interceptions were allowed to continue and to be renewed by the orders of November 23, 2005 (Government Exhibit 2) and December 8, 2005 (Government Exhibit 3).

Since the October 25, 2005 application with the October 25, 2005 affidavit of S.A. Yervelli met the statutory "necessity" requirement, defendants' argument that the subsequent wire interception orders of November 23, 2005 and December 8, 2005 are invalidly based upon a non-complaint application of October 25, 2005 necessarily fails.

## CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that defendants' motion (Docket #176), to suppress be **DENIED**.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the

Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and**

**Order), may result in the District Judge's refusal to consider the objection.**

/S/ *H. Kenneth Schroeder, Jr.*
_____
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

**DATED:**   **Buffalo, New York**
            **April 28, 2008**